Your Honor, third case of the morning call, Mr. Richard J. Donow v. Bettig, Eric E. Bettig, and Joseph P. Sauber on behalf of the appellant, Mr. Joseph P. Sauber, on behalf of the appellant, Mr. Robin J. Metz. All right, Mr. Sauber. May it please the court, and I am Joseph Sauber, representing myself this morning, and Eric Pag. On this case, Your Honor, the call of the appellant to decide whether an attorney owes a duty to his client's adversary. Specifically, I guess, a duty to provide accurate information, as is the case involving negligent misrepresentation. Fortunately, for Your Honor, Your Justices, there's plenty of precedent on this issue, and the cases have all held the attorney owes no duty to anyone but his client. In order to determine whether or not there is a duty, what do we look at? And does it matter if this is a negligent misrepresentation case or an attorney malpractice case? What does the case law tell us? What do we look at? I don't know what the case law tells you what to look at in establishing a duty. I apologize. That is something that I think it's what society has decided, if I have to go back to my law school days, as to on whose responsibility should rest taking into effect the cost and benefit analysis and all these things. Well, isn't there a Supreme Court case, Helen v. Greshammer, 92 Illinois 2nd 13, a 1982 case, that really talks about duty in this context? It clearly talks about to whom an attorney owes his duty. Correct? He owes a duty only to his client, and actually that case expanded the duty to those for whom his services were to confer a direct benefit. And it expanded the duty. But how do we decide who he owes the duty to? Well, maybe I'm sorry. Maybe my question wasn't articulate enough. That's what I was really trying to focus on is really that, that we have to look at when we're talking about an attorney in this position. Do we look at the attorney-client relationship and whom it was designed or contracted to benefit? Correct. And it must be specifically designed to benefit the third party if it's not the client. Okay. And here, can you talk about the attorney-client relationship and who you were retained to confer a benefit on? Clearly, Eric Batang and his wife, Joanne, in the underlying lawsuit. That's who I was hired to represent, and that's whom I did represent in the underlying lawsuit. My client's adversary was the person who is now suing me, Richard Knaut. And I owe him no duty. And it- Well, what about do you not owe a duty because you were in the business of or part of your responsibilities were to supply information regarding insurance liens? Not in the sense that it would create a cause of action against me. And we're kind of getting into what I would agree to in a great area in this. The case is all saying the attorney doesn't owe a duty to anyone but his client. But they all- it seems as if what they're really saying is an attorney has a privilege that no one but his client can sue him for the negligence he would normally- the negligence that he's being sued on. To his client, he's hired to provide accurate information, and his client certainly could sue him for the negligent misrepresentations he would make. But a third party cannot because he doesn't owe this duty to them that he does owe to his client. And, again, I- it's almost as if it's given as a privilege. And, you know, and that's really the- none of the case is, is there a duty owed? And no court has ever found one, ever. And the courts actually seem to go out of their way to protect the attorney-client privilege, if you will, or relationship, making it clear that we're not going to allow a duty by the attorney to a third party to interfere with it. Because as soon as you give that third party, someone who is not the client, some duty owed to him or some basis to seek something, some- even be it accurate information from his adversary's attorney or defendant from the plaintiff's attorney, it interferes with the relationship between the attorney and his client. Now, so you're saying you didn't have the duty to provide accurate instructions to Attorney Penas when settlement drafts were requested or- and when you knew that drafts would be issued according to the instructions that you gave. No, I think everyone should always try to give accurate information. And- but when you talk about the duty, do I have a duty to give that accurate information? Now we're talking about the rise to a duty that if I breach it, I'm liable. And I would say no, there's absolutely no duty on my behalf to provide that accurate information to Mr. Penas in this case. Or to- or to Mr. Connell or anyone else. Just moments ago, we heard argument about custom and practice. And it appears that the custom and practice is that the attorney on behalf of the plaintiff, who is the party who's receiving- in this case, it was called the, you know, the settlement. It was up to that person, and that person happens to be you, to negotiate if possible, resolve if possible. But in any event, take that fund of money and make the payouts that need to be made paid out. And auto owners was part of this record at the- of this case at the time, correct? Correct. And we, at least based upon what I saw in- or heard in the last hearing, auto owners never got any sort of a CC or a letter from you saying these are the amounts that are being paid. These are the drafts that are being sent from you. Is that correct? That's what I would call correct. I do not copy auto owners out of that. Why wouldn't the person who everybody is relying on, and that was you, notify everybody what was happening? Typically, short answer, I was handling the medical aspect. In a typical personal injury lawsuit arising out of a car accident, the plaintiff's attorney will handle or arrange with the insurance company to handle the personal injury aspect, the medical bills, if you will. Usually, because it doesn't benefit the plaintiff, the plaintiff's attorney will not deal with the property damage claim. And those property damage claims are generally, in my experience, dealt with directly between the attorneys or the insurance companies. A typical insurance policy gives you like 50-150. Well, that last 50 is for the property damage claims. And generally speaking, therefore, when the plaintiff's insurance company pays the property damage, they take the claim directly to the insurance company. What really happened here that, you know, kind of I was not used to dealing with is there was no set-aside portion in the insurance policy, in Kanawha's insurance policy for property damage. And I presumed there was. And I just presumed that auto owners and Kanawha were directly dealing with that. And I did have conversations with auto owners in which I was specifically told and inquired whether they wanted me to pursue the property damage claim. I was told not to. And in the record, there is my affidavit. It was attached to Kanawha's response to the motion for summary judgment. No, no, no. It's attached to auto owners' response to the motion for summary judgment filed by Kanawha. I believe it's pages like 87 and 88 of the common law record in which I said I was not handling the property damage claim. And so when it came up, it was like that wasn't mine. And so I never dealt with it. I was handling the personal injury claim, which included the medical bills and all the medical leave, as I saw it. You also sent out the letters with the potential negotiation of that $28,000 to $19,000 that we heard about before. That was after the case had settled. It was from Ms. Bailey, Julie Lane Bailey. And it was sent to me that she would, that auto owners would agree to the common law fund deduction of a third. All right. I understand that concept of maybe the property damage entity, the insurance company, the party responsible, is not part of the total litigation. But in this case, they had filed an appearance in this case. And so that's a slightly different issue. Why, then, would they not still be at least CC? You're not negotiating on their behalf, but why didn't you at least CC them with information? This is what, these are the drafts that I've been presented with, or these are the things. And if this is a custom and practice issue, is this maybe a practice that should be considered in the future? I would say it's very, this is a very unusual case, you know, in many respects, in that it didn't involve a normal, it involved a car accident without a normal auto insurance policy. I have to follow my sword. I probably should have copied Ms. Bailey out of the correspondence, and I don't know why I didn't. One of the things I can say, it just never dawned on me, and it was my error, I guess, that the letter I did send out with the $3,300 check went to TransPAC, I do believe. So in a way, it wasn't to her client. You could argue that it wasn't to auto owners, and maybe that's why my brain didn't click back to it. And why did it go to TransPAC? TransPAC is the entity, as I understand it, is the entity that auto owner uses to handle its subrogation claims. And you know that because, again, custom and practice? No, because I got the letters from TransPAC, and in this case, TransPAC is names all over everything, and I think it was a TransPAC employee who was the first witness in the underlying trial of this case, the subrogation case. All right. Well, your retention to represent Mr. Bettig did not necessarily cover any obligation in your argument to Mr. Conow. Correct. Absolutely. Your client, who thought his case was settled, is now again before court. Correct. How does your obligation to your client fit into this issue? You settled it for him. I settled it for him. I paid for him. But there was a car involved. Correct. I mean, he didn't walk out into the middle of the street. He was in the car when he got hit. Correct. And his car was towed. Correct. So how, then, have you satisfied your claim to your client because he's back in court again? If you're asking, I guess, if this judgment was affirmed and the court was to find an inordinate duty to Mr. Conow, as the pleadings even says, Mr. Bettig's liability is through Sauber on Sauber. Right. We paid the judgment. I mean, that's the bottom line of that. Mr. Bettig did nothing wrong. This would be mine to eat if there was error found on my behalf. But, again, I Can there be independent responsibility even if Conow, you owe nothing to Conow other than, you know, say hello to him on the street if you ever see him again? Just the fact that your client's back in court, does that create a problem? My client is very unhappy with this. He doesn't understand this. It got worse when his wife had a judgment entered against her. Try to explain that to your client. That's why I do this. I apologize. I would ask that that judgment be vacated. I think it is moved with the new judgment, the one we're going to appeal on. But there was the original judgment, and when we entered the new order, we entered the judgment, you know, in favor of auto owners against Conow and Conow against myself and Mr. Bettig. But we never vacated that previous judgment. And that was kind of an oversight on our behalf. And I think everyone just presumed the new judgment made the other one move. But, technically, that judgment does. Yes, that is. That is the last portion. But nobody asked for that in the trial court. That is correct. Well, the judge says draft your order. We drafted it. And it contained what we all knew what the judge wanted the judgment to be or how he wanted it to flow. And in doing my appeal or preparing even a notice of appeal, it came to my attention, we never vacated that previous judgment of the new order. And that is why I did ask for that in this appeal. So it is a very minor thing. Mr. Sauber, I know that it is by virtue of custom and usage that you, that the plaintiff's attorney, which in this case was you, undertakes to resolve the liens with each individual lien holder. By voluntarily undertaking that responsibility, is there any corresponding duty that is created to anyone other than your client? Whether it is voluntary, again, this is how I understand it. There is the Medical Lien Act. And under the Medical Lien Act, the lien holder or the hospital should give notice to the plaintiff's attorney or the plaintiff and the responsible parties, usually their attorneys. But the lien is actually on the settlement funds or whatever money is derived by judgment, settlement, whatever they mention. So they actually have a lien on that money that the plaintiff is going to receive. So at that point, I think it is somewhat of a duty on the plaintiff's attorney, especially to protect his client, to make sure those liens are paid and or settled and or compromised. But they must be dealt with because they clearly attach to that money that you receive on behalf of your client. And if you don't take care of those liens, my understanding is the lien holder, the hospital, the medical provider, comes back and looks at the plaintiff's attorney for payment. Any more questions? But that doesn't extend to how those medical bills came about, i.e., the accident, that issue that you just discussed with Justice Spence. I must apologize. I didn't understand that question. You said that the medical provider could come back to you if it wasn't properly resolved. Correct. Well, where there is that the injury that caused the medical cost is an accident with property damage, it's not the same theory that then that's not a custom and usage practice? I would say not. It's not because you're talking with subrogation rights. And the insurance company has a subrogation right, not a lien right. And I've argued that there's a difference in there. And I think there is really in practice and in reality. And not to open up a can of worms or something, but you have the Tenney letter that is often at issue in a case involving the medical bills, where the insurance company sends a letter to the plaintiff's attorney saying, do not collect those medical bills. We'll collect them under our subrogation rights. And that's got its whole world of law into it. But normally speaking, the plaintiff's attorney does handle the medical aspect and collects the medical bills on behalf or the medical pay on behalf of the insurance company. Well, is there a difference between a lien and a subrogation claim? Here, at least in this context? Yeah. In the context of a personal injury case, the lien actually attaches. A lien attaches as a right to be the property in a foreclosure or in a mortgage or mechanics lien. It attaches to this right or to this asset, the settlement. A subrogation is its own right. It doesn't really attach to anything. Under the Medical Lien Act, if the plaintiff walks away from his claim, says, you know what, that's it, see you, I'm out of here, the medical providers lose their lien rights because then there will be nothing for them to attach to. The insurance company has a subrogation claim. It steps into the shoes of the plaintiff. At that point, it can bring its own lawsuit against the tort reason. Its rights, it doesn't have to hope that the tort reason creates this fund of money onto which they can get paid. It has its own right, as the auto owners did in this case, to pursue a subrogation claim directly against the tort reason. A lien holder like the classic medical provider has no such right. Thank you. Thank you. Thank you. Mr. Metz, welcome back. Thank you. Thank you. On behalf of, again, Mr. Cannell, we're here basically because of the representation made in this Exhibit 6, this letter of September 10th. And talking about, you just got done talking about the difference between a lien and a subrogation interest. The letter talks of liens. It talks of, I resolved all liens, and clearly auto owners is listed in this list. So he referred to auto owners' settlement as a lien. And I would just submit that in discussing the issue of attachment, once a letter is sent out, or in this case even, there's an actual intervening complaint file, there's an attachment at that point with regard to other parties as to the right to collect. Let me go back a minute. So you said you referred to auto owners' amount there as a lien. That would have really been only the medical aspect that would have been referenced, not the property damage, right? Correct. And the medical is also a subrogation right, essentially. I mean, they're both from the same context. They're payments made by the insurance company to pay for different elements of a claim of damage for their insurer. So they're both start out as subrogation rights. And I'm just merely indicating that you can't differentiate the two when you're referring to the representation made in this case because they're the same thing. So representation in this letter, there were two things represented, or two things indicated. One is that here's all the liens have been resolved, including auto owners. And then secondly, there's a request for payments to be made. Now, Mr. Sauber testified in this case that he never advised Mr. Feenis at any time that he didn't in fact negotiate one of the two claims of auto owners. He never let him know that. I think he actually said in his brief that he never negotiated the property lien with Mr. Feenis. Well, he wouldn't negotiate it with Mr. Feenis. He'd negotiate it with auto owners or their attorney or Transpac. Based upon that custom and practice we heard a lot about before and then confirmed here, if this is primarily an injury suit, what is the custom and practice about dealing with the property damage? On page 73 of the record, I'm glad you brought that up, he made the comment that there was a distinction between property and medical in terms of his custom and practice. But I specifically asked him at the trial in this case on page 73, I said I'm specifically referring to dollar amounts of the claims for lien or claims for rights of subrogation, which would affect the bottom dollar that the plaintiff would receive in the case. So in other words, after settlement is reached in principle between plaintiff and defendant, whatever the amount is going to be determined to be for the lien or the subrogation right, that's typically subject to negotiation between a plaintiff and a claim holder. Answer, the lien amounts, yes. So he didn't make any distinction at trial between the two in terms of custom and practice. So that is part of the custom and practice for, and that's what Mr. Feenis testified to, that both property and medical are typically negotiated against their insurer. It's their insurer and their payments made to them. So that's why we're here. I mean, the six elements, we really narrowed down the six elements here that were involved in the misrepresentation. The first five, I think, I've messed no problem. In the false statement of fact, I think it's clear from this statement that that's not true. All claims were not resolved. The second was there's some carelessness and neglect in ascertaining the truth. Well, he never told Mr. Feenis, writing this letter without saying, by the way, I didn't negotiate, it's clearly careless or I would say negligent in terms of Mr. Feenis relying on it and its representation. Intent to induce, well, the second paragraph of the letter says, please write checks to this amount. He's asking to send these checks, totaling $2 million, and asking us to pay out on the representation in the first paragraph that everything's being covered. Let me just ask and interrupt, I don't know if you want to go back to that. But we talked earlier with opposing counsel about the test for duty set out by Pelham versus Grushiner and the primary purpose test. If that test applied, wouldn't Konow have to show that the primary purpose, the primary purpose of the attorney-client relationship between Salver and Beddick was to settle the auto owner subrogation claim? I would say it was to derive money through either settlement or a verdict for his client, as much money as he could possibly get. That's his primary purpose, to get the Beddicks as much money, whether it be by settlement or by trial, as he possibly can in the case. That's his primary purpose. I'm sorry. A part of that process certainly involves dealing with claims against that settlement, whether they be subrogation rights or lien rights. That's a part of that purpose. Whatever comes out of that is going to lessen the amount that the Beddicks get in this case. So you're saying then Konow is a third-party beneficiary of that relationship? Can we go that far to say that? I mean, isn't that what we have to say? Well, maybe. There's one thing that wasn't actually thrown out here that I'm getting to right now, and that's that on the issue of duty, there's been no reference to the fact that there's a code of ethics here. And Konow, in the other case, mentioned a code of ethics. It's in my brief, and I cite it to the Code of Ethics, I believe it's Rule 8.4, that requires an attorney who makes an affirmative statement. They don't have a duty to initially say anything to oppose and counsel in the case, but if they do, they have a duty of candor. They have a duty to be honest and forthright and not misrepresent facts to oppose and counsel in the case. So it's almost, in essence, a duty to not misrepresent facts, which in this case is what happened. I would submit there's a duty by virtue of the rules of conduct to oppose and counsel, which is part of the primary purpose of the case here for the bettings, to obtain as much money as I can for my client. As a part of that, he has to deal in candor and honesty and advise our client in the case. If you want to say third-party beneficiary, fine, but he owes a duty to them by virtue of that, so that we can deal with the lien and get it paid. But didn't Konow have an independent responsibility, really, to communicate directly with auto owners about this? One could argue that, but when it's represented to you that here's the, and again, going back to the issue of custom and practice, it's their provider. It's their insurance carrier. Mr. Sauber has communicated with them. He had indicated here he had letters from them. He was in communication with them, even probably, I'm assuming, before the case was going on. But in any event, they paid out to his client. It's his own insurer.  We really can't even talk to them because there's an issue with talking to a doctor in a case. The trouble, I believe. So that's custom. Getting back to custom and practice again, and could we have had, I think when this gets back to the issue of could Mr. Fiennes have asked for something in writing? Yes, he could have. That's one thing he could have done, ask for something in writing from the lien holder. He chose not to. He chose to rely here, but he also did so by sending out a check with a full payment information on it. But even a phone call to, is it West Bend? Is that the entity? Yeah, West Bend is the insurance company. Hey, did you guys pay out something on this vehicle? Well, actually, it would be auto owners in this case. Okay. You're talking auto owners. That's got the lien. I'm confused. And I guess, again, this custom of practice, that being his carrier, Mr. Fiennes assumed that he was in contact with his carrier and that they would have known. But I thought, Mr. Metz, would you characterize that duty that you kind of referred to, that ethical duty, which I'm assuming you could say that every lawyer has that duty as an officer of the court. I believe that's correct. Would you go so far as to say that that supersedes a duty to your client or takes precedence? How would you characterize it? I should know this because I actually took an ethics test not too long ago. I think that, I mean, there's obviously some conflict there. There's a confidential situation, but I think that when you make an affirmative statement, I think that you have to be honest in a situation with the plaintiff during the case. You certainly have a right not to say anything. Mr. Sauber had a right not to make any representations and say, Hey, Judge Fiennes, you and Mr. Fiennes, you go ahead and find out yourself. I give you permission to contact them and negotiate yourself. He could have done that. He didn't have any obligation to do anything in that regard, although I think it was in the best interest of his client to do that. But I don't think there needs to be a conflict between the two, or certainly there wasn't in this case. But I think if he affirmatively says something and affirmatively makes representation, that's where the duty comes in not to misrepresent. There's a whole line of cases that aren't directly on point here, but that do discuss a lawyer's obligation as an officer of the court. If he knows, for instance, that a witness is going to testify untruthfully, to take steps there. And I think we're all familiar with those. I guess, I don't know, does Ed? And I think that's why I said I don't think he has an obligation to do, rather than to misrepresent, he needs to say nothing. You know, it's not, he can't, I don't think he can, because he's protecting his client, he has no right to make a false statement to better represent his client. He's going to make a statement, which he doesn't have to. He's going to represent regarding a lien or a subrogation amount. He has to do it honestly. It's just like the situation where you can't put somebody on the stand, you know it's going to lie. Right, and in this case, because it appears even from Mr. Stauber's own statement, that this certainly wasn't intentional, it was part of this whole process of medical versus property damage. Would that obligation to be truthful still apply? In that we're not saying it was done purposefully. Is that when you quoted the careless or negligent before, which would indicate not intentional? That would indicate, the other thing that's kind of strange, but in looking through the facts that came out in this case, and the conversations that he had with Ms. Bailey afterwards, there was no mention of this letter in the representation made for her. So according to Ms. Bailey's testimony, so she wasn't aware specifically of this letter or what was represented in that. He just said he wasn't going to pay it, which I found was kind of odd. But yeah, I'm not, you know, the complaint is for negligent, but certainly I think it's pretty apparent from what he said that it was false, and it was easily ascertainable because he knew he didn't make any contact. In fact, he knew he only resolved one lien, yet he put something different in this letter. So, and I think, you know, the last thing I guess I'll comment is we talked about the Pelham case, and that case does seem to, you know, start to expand what duties can be held against a lawyer who's to other parties other than their client. And I know they talk about torts and abolishing the privity requirement citing to the Rosner case. And so it seems like there's a loosening up there. In a situation like this, you know, we have a new act that came into play regarding the settlement and the concurrence that they put in and the burdens that they place on the defendants and so forth. And this certainly could be a limit we've talked about with regard to an attorney in this sort of situation where we have a settlement that, hey, you know, you have to communicate proper intimate information to a defendant in order for them to resolve these types of things in a timely fashion. Well, so in this situation, I mean, wasn't Konow's attorney's obligation under the settlement agreement to provide for payment to the beddocks? That's correct. All right. So then you're saying what information did Mr. Salver fail to provide to Konow's attorney? And just so I'm clear, when he failed to provide, again, my argument here is that the information that he did provide was misrepresented. But the information that is typically custom practice given is if there's a lien claim or we receive, we being defendant in a case paying out, receive a claim of right of subrogation in a case like in this case we did, then we can't pay off, we can't pay out without paying those entities. Otherwise, there could be a double payment. We go ahead and pay out. Say we give the whole million-dollar check to the beddocks and Mr. Salver. We don't include any lien holders on it. Well, those lien holders then have a right to come back and say, hey, you never paid us. And we'd have to pay them. And even though we paid, so now there's going to be a double payment. There's going to be additional monies that were in jeopardy there. So that's what I was referring to. Any further questions? Thank you. Thanks for your time. Mr. Salver. Just want to emphasize that this is a case about duty. I know we've been talking a lot this morning about custom practice, but that's a rabbit hole. We don't have to go down on this case. The case is about duty. And there is no duty by an attorney to his client's adversary. To the extent that a rule of ethics is violated or a violation of the code of ethics, there is the ARDC, there is Rule 137, and there are many avenues to address that issue of violations of the code of ethics. They don't get addressed by opening up and allowing an adversary or an attorney to be sued by the other party. That would be allowing the camel's nose in the tent and just create nothing but trouble down the line. Think of a situation where the plaintiff's attorney gets interrogatories and these answers are interrogatories and he puts down $7,300 instead of $730 for some medical payment or doctor's payment or hospital payment. And based on that extra zero in the answers to the interrogatories, the defense counsel and insurance company defendant says, okay, we're going to pay X amount of dollars. After the case is all settled, they learn, wait a second, this bill is only $730. In the answers to the interrogatory, they said it was $7,300. There was inadvertently another zero added. But because of that, we paid out an additional, pick your number, $10,000, $7,000, $21,000. After that settlement is done, now we have a situation where somebody gets to sue the plaintiff's attorney for the negligent misrepresentation of the answers to interrogatories because they were wrong. And this could happen in any number of situations. That just can't be allowed. It's an adversarial proceeding. Everyone's fighting for the truth. This adversarial stuff has worked for a long time. You have your own attorney. He looks out for your interest. The attorney's interest is to his client and only to his client. He doesn't have to worry about the representation he makes to the other side until he violates the Code of Ethics or Rule 137 or what have you. But until then, it's, you know, everyone looks out for their own interest. It's an adversarial proceeding. And in literally the hundreds of years that we've had this process, it's worked really well at getting to the truth where the attorney's duties are to his client and only to his client and nobody else. And this is not the case, nor will there ever be a case, to expand that duty to a third party. Thank you. Thank you. All right, again, gentlemen, thank you again for being here this morning. We will take the matter under advisement. We will stand in recess now to prepare for our next oral argument and have a good day.